**WHITE MOUNTAIN APACHE TRIBE,**
**Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

No. 00–5044.

United States Court of Appeals,
Federal Circuit.

DECIDED: May 16, 2001.

Robert C. Brauchli, Brauchli & Brauchli, P.C., of Tucson, AZ, argued for plaintiff-appellant.

Elizabeth Ann Peterson, Attorney, Appellate Section, Environment & Natural Resources Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief was Lois J. Schiffer, Assistant Attorney General.

Before MAYER, Chief Judge, MICHEL and DYK, Circuit Judges.

Opinion for the court filed by Circuit Judge DYK. Dissenting Opinion filed by Chief Judge MAYER.

## DECISION

DYK, Circuit Judge.

This case presents the question of whether a 1960 Act of Congress, Pub.L. No. 86–392, 74 Stat. 8 (1960) (the "1960 Act"), obligates the United States to maintain or restore certain property and buildings held by the United States in trust for the White Mountain Apache Tribe (the "Tribe")[1] so that the Tribe can maintain a suit for damages in the Court of Federal Claims. We hold that it does, though the obligation created is narrower than that claimed by the Tribe. We accordingly reverse and remand the decision of the Court of Federal Claims in *White Mountain Apache Tribe v. United States*, 46 Fed. Cl. 20 (1999), for further proceedings consistent with this opinion.

## FACTUAL BACKGROUND

In 1870, the United States Army established a military post known as "Fort Apache" on approximately 7,500 acres of land within the borders of what later became the White Mountain Apache Tribe's reservation in Arizona.[2] The Army operated Fort Apache as a military post until 1922, when Congress transferred control of the Fort to the Secretary of the Interior, and designated approximately 400 acres of the Fort for use as a boarding school for Native American children to fulfill certain unspecified treaty obligations of the United States. *See* 25 U.S.C. § 277 (1994).[3]

In 1960, Congress passed the 1960 Act which declared the Fort to be "held by the United States in trust for the White Mountain Apache Tribe, subject to the right of the Secretary of the Interior to use any part of the land and improvements for administrative or school purposes for as long as they are needed for that purpose." Pub.L. No. 86–392, 74 Stat. 8 (1960). Pur-

---

1. The Tribe is a federally recognized Native American tribe organized under section 16 of the Indian Reorganization Act of 1934, 48 Stat. 984, 25 U.S.C. § 476.

2. The Tribe's reservation was established by an Act of Congress on June 7, 1897. 30 Stat. 62, 64 (1897).

3. That statute provided that "[t]he Secretary of the Interior is authorized to establish and maintain the former Fort Apache military post as an Indian boarding school for the purpose of carrying out treaty obligations, to be known as the Theodore Roosevelt Indian School: Provided, That the Fort Apache military post, and land appurtenant thereto, shall remain in the possession and custody of the Secretary of the Interior so long as they shall be required for Indian school purposes." 25 U.S.C. § 277.

suant to that statute, the government allegedly controls and has the ability to use approximately thirty-five buildings on the site. The Court of Federal Claims found, and the parties do not dispute, that a small number of students are currently enrolled in the school, and that "the future of the school as a viable institution is apparently under review." *White Mountain Apache Tribe*, 46 Fed. Cl. at 22 n. 2. According to the parties, the government has offered to terminate its trusteeship over an unspecified number of the buildings and to transfer control of them to the Tribe. The Tribe, however, has refused to accept that offer unless and until the government rehabilitates the buildings. The record does not reveal whether the United States has turned over any of the buildings to the Tribe.

At issue in this appeal is the government's obligation as trustee to maintain and restore those buildings, which include, *inter alia*, barracks constructed by the United States Army, the Native American boarding school and student dormitories, and various administrative buildings constructed by the Department of the Interior.

According to the Tribe, the government has had exclusive access to and control over those buildings and has allowed many of them to fall into disrepair. The Tribe alleges, and the government does not dispute, that the Department of the Interior has condemned and demolished several buildings deemed to be unsafe. The Tribe contends that it has repeatedly requested, to no avail, that the Secretary of the Inte-

rior and the Bureau of Indian Affairs maintain and restore the trust property. In May of 1993, the Tribe adopted a "master plan"[4] for the preservation and restoration of the Fort. In November of 1998, the Tribe commissioned an assessment of the trust property and obtained cost estimates for the repair and preservation of the buildings. According to that report, as of 1999, the total cost to rehabilitate the buildings amounted to approximately $14 million dollars. The government responds that it has indeed maintained and restored some of the thirty-five buildings, but acknowledges that others are dilapidated.[5]

On March 19, 1999, the Tribe commenced a breach of trust action in the Court of Federal Claims seeking $14 million dollars in damages for the government's alleged breach of "its fiduciary duty to maintain, protect, repair and preserve the Tribe's trust corpus." The Tribe alleged that its claim arose under the 1960 Act, as well as the Snyder Act (codified at 25 U.S.C. § 13), the National Historic Preservation Act of 1966 (codified at 16 U.S.C. § 470 *et seq.*) and a variety of other federal statutes and regulations.

The government filed a motion to dismiss for failure to state a claim upon which relief may be granted and for lack of subject matter jurisdiction. In that motion, the government argued that neither the 1960 Act, nor any of the other statutes and regulations cited by the Tribe, imposed an obligation on the United States to maintain or restore the buildings held in trust for the Tribe, and that the Tribe had not

---

4. The Tribe does not define the phrase "master plan." The Tribe's complaint merely provides, in pertinent part, that in 1993, "the Tribe declared its intent to intervene and save its imperiled trust property and adopted a Master Plan to protect, preserve, maintain, repair, rehabilitate and restore said property within the Historic District as a cultural and economic resource for the Tribe."

5. We note that in 1976, the National Park Service designated the Fort as a National Historic Site, and that in September 1997, the World Monuments Watch placed the Fort on the "1998 List of 100 Most Endangered Monuments." *White Mountain Apache Tribe*, 46 Fed. Cl. at 22.

stated a cognizable claim for money damages for the government's alleged mismanagement of that trust property. In addition, the government contended that the Tribe's breach of trust claim, even if otherwise valid, accrued outside the six-year statute of limitations period governing claims brought against the United States under 28 U.S.C. §§ 1491 and 1505.

The Court of Federal Claims agreed with the government that the Tribe had failed to prove the existence of a fiduciary obligation on the part of the United States that would, if breached, give rise to a claim for money damages, and dismissed the complaint for failure to state a claim. In reaching that decision, the court relied on two Supreme Court cases which establish the principles governing breach of trust claims by Native Americans against the United States, *United States v. Mitchell*, 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) ("*Mitchell I*"), and *United States v. Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) ("*Mitchell II*").[6] The Court of Federal Claims found that the language of the 1960 Act "creates a limited, or bare trust relationship between the government and the Tribe," akin to the trust relationship created by the General Allotment Act of 1887, 24 Stat. 388, codified at 25 U.S.C. § 331 *et seq.*, which was found in *Mitchell I* not to impose fiduciary duties on the United States. *White Mountain Apache Tribe*, 46 Fed. Cl. at 26. The court further noted that unlike the statutes and regulations found to create fiduciary duties in *Mitchell II*, the 1960 Act "does not direct the government to manage the Fort Apache site for the benefit of the Tribe." *Id.* at 26.

The court also rejected the Tribe's argument that, even if the government had no fiduciary obligation to maintain the property for the benefit of the Tribe, the government was liable for its failure to prevent deterioration of the property under a "permissive waste" theory, by analogy to property law. (Under this theory, as articulated by the Tribe, the United States, as the current tenant of the trust property, would be required to take reasonable steps to prevent deterioration of the property in anticipation of its transfer to the Tribe.) The court disagreed, noting that "the difficulty with plaintiff's argument is that an action for permissive waste, even if proper, does not ordinarily give rise to a money claim." *Id.* at 28. Referencing a secondary source that summarized sections 188, 189 and 195 of the *Restatement (First) of Property* (1936), the court observed that "[t]he law on 'permissive waste' provides that the appropriate remedy for permissive waste is generally an injunction," an equitable remedy that the Court of Federal Claims lacks jurisdiction to award. *Id.* But cf. *Bobula v. United States Dep't of Justice*, 970 F.2d 854, 858 (Fed.Cir.1992) (noting that equitable relief is sometimes available in a suit brought under the Tucker Act, 28 U.S.C. § 1491, when that relief "is incidental to and collateral to a claim for money damages"). In short, the court concluded that it lacked jurisdiction over the Tribe's claim and accordingly dismissed the action for failure to state a claim upon which relief may be granted. The court did not reach the government's statute of limitations argument. This timely appeal followed.

## DISCUSSION

### I

■ The question before us is whether the Court of Federal Claims erred in dismissing this breach of trust claim against the United States for failure to state a claim upon which relief may be granted. We review that decision without deference.

---

6. The *Mitchell* cases are discussed in detail in part IV of this opinion, *infra*.

*First Hartford Corp. Pension Plan & Trust v. United States,* 194 F.3d 1279, 1286–87 (Fed.Cir.1999). We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(3) (1994).

## II

■ The Tucker Act gives the Court of Federal Claims jurisdiction over broad categories of claims against the United States and constitutes a waiver of sovereign immunity as to those claims. 28 U.S.C. § 1491 (1994); *Mitchell II,* 463 U.S. at 212, 103 S.Ct. 2961. A companion statute, the Indian Tucker Act, further confers jurisdiction on the Court of Federal Claims to hear any claim brought by a Native American tribe against the United States that "is one which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe." 28 U.S.C. § 1505. Although the Tribe premised jurisdiction in the Court of Federal Claims upon both statutes, it is § 1505 that primarily confers jurisdiction over this action.

■ However, it is axiomatic that these two statutes are merely jurisdictional and do not create "any substantive right enforceable against the United States for money damages." *Mitchell II,* 463 U.S. at 216, 103 S.Ct. 2961 (discussing the Tucker Act); *Mitchell I,* 445 U.S. at 540, 100 S.Ct. 1349 ("It follows that 28 U.S.C. § 1505 no more confers a substantive right against the United States to recover money damages than does 28 U.S.C. § 1491."). Thus, in order to state a claim, the Tribe must point to some other source of law, such as "the Constitution, or any Act of Congress or any regulation of an executive department" that imposes an obligation on the United States to repair and preserve the Tribe's trust property. 28 U.S.C. § 1491(a)(1). The Tribe must also demonstrate that the source of law relied upon "can fairly be interpreted as mandating

compensation by the Federal Government for the damages sustained." *Mitchell II,* 463 U.S. at 217, 103 S.Ct. 2961 (quoting *United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976)).

## III

Before the Court of Federal Claims and on this appeal, the Tribe argued that a variety of statutes and regulations, other than the 1960 Act, impose fiduciary obligations upon the United States. We disagree.

■ The Snyder Act governs the general appropriations of the Bureau of Indian Affairs ("BIA"). It provides, in pertinent part, that the BIA "shall direct, supervise, and expend such monies as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians throughout the United States for the following purposes: ... For industrial assistance and advancement *and general administration of Indian property.* ... For the enlargement, extension, improvement, *and repair of the buildings and grounds of existing plants and projects.*" 25 U.S.C. § 13 (emphases added). We agree with the Court of Federal Claims that this statute fails "to provide a basis for a money-mandating claim as laid out in *Mitchell II.*" *White Mountain Apache Tribe,* 46 Fed. Cl. at 26. Indeed, in *Lincoln v. Vigil,* 508 U.S. 182, 194, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993), the Supreme Court held that the "general terms" of the Snyder Act do not require expenditure of general appropriations on specific programs for particular classes of Native Americans. *See also Vigil v. Andrus,* 667 F.2d 931, 934 (10th Cir.1982) (holding that language of the Act is "too broad to support a conclusion that Congress has expressly appropriated funds for lunches for all Indian school children").

While other statutes or regulations relied on by the Tribe may impose obligations on federal agencies, none of these statutes or regulations imposes fiduciary obligations that would lead to a claim for money damages. *See* the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470 *et seq.* (requiring federal agencies to manage and maintain historic properties under their control); the Historic Sites, Buildings, Objects, and Antiquities Act of 1935, 16 U.S.C. § 462(f) (requiring Secretary of the Interior, *inter alia*, to "[r]estore, reconstruct, rehabilitate, preserve and maintain" any historic or prehistoric buildings or property); Title XI of the Education Amendments Act of 1978, 25 U.S.C. § 2005 (requiring the Secretary of the Interior to bring "all schools, dormitories, and other facilities" operated by the Bureau of Indian Affairs "into compliance with all applicable Federal, tribal, or State health and safety standards"); the Improving America's Schools Act of 1994, 25 C.F.R. § 32.4(s)(2) (requiring federal government to "[m]aintain all school and residential facilities to meet appropriate Tribal, State or Federal safety, health and child care standards"); 25 U.S.C. § 177 (precluding conveyance of Native American lands without United States' approval); the American Indian Trust Fund Management Act of 1994, 25 U.S.C. § 4043(c)(5)(C)(ii) (requiring Special Trustee for Native Americans to certify that the Department of the Interior's budget requests to Congress are adequate to "discharge, effectively and efficiently, the Secretary's trust responsibilities" to Native Americans). Thus we find that none of these statutes or regulations "can fairly be interpreted as mandating compensation by the Federal Government for the damages

sustained," *Mitchell II,* 463 U.S. at 216–17, 103 S.Ct. 2961, to the trust property.

Accordingly, we turn our attention to the 1960 Act.

## IV

As noted earlier, the 1960 Act provides, in pertinent part, that certain lands and improvements thereon shall "be held by the United States in trust for the White Mountain Apache Tribe, subject to the right of the Secretary of the Interior to use" the property "for administrative or school purposes." Pub.L. No. 86–392, 74 Stat. 8 (1960).

Both the Tribe and the United States in their briefs agree that the 1960 Act creates a "trust." [7] The statute itself states that the land and "improvements thereon" are held "in trust" for the Tribe. Moreover, it is well-established that a common law trust arises when three elements are present, namely, a trustee, a beneficiary, and a trust corpus. *Restatement (Second) of Trusts* § 2 cmt. h (1959); *see also Mitchell II,* 463 U.S. at 225, 103 S.Ct. 2961; *Cheyenne–Arapaho Tribes v. United States,* 966 F.2d 583, 589 (10th Cir.1992) (listing elements of common-law trust), *cert. denied,* 507 U.S. 1003, 113 S.Ct. 1642, 123 L.Ed.2d 265 (1993). In this case, all of the necessary elements of a common-law trust are present: a trustee (the United States), a beneficiary (the Tribe) and a trust corpus (the land and buildings held in trust).

However, the mere fact that the 1960 Act creates a trust relationship does not end the inquiry. We must also determine whether there is a fiduciary obligation created by the 1960 Act or merely a "bare trust." *Mitchell II,* 463 U.S. at 224,

---

7. Inexplicably, at oral argument the government reversed its position by arguing that a beneficial interest in the property had not yet passed to the Tribe. But for the reasons stated in the text, we find that the 1960 Act creates a "trust."

103 S.Ct. 2961. If there is no fiduciary obligation, then there is no claim for money damages for the alleged breach of that obligation.

▬▬ In *Mitchell I*, the Supreme Court held that federal statutes and regulations that create only a "limited trust relationship" between the United States and Native American tribes do not impose fiduciary obligations that give rise to claims for money damages. 445 U.S. at 542, 100 S.Ct. 1349. The statute at issue in that case, the General Allotment Act of 1887 (codified at 25 U.S.C. § 331 *et seq.*), provided in pertinent part that the United States was to "hold the land thus allotted ... in trust for the sole use and benefit of the Indian to whom such allotment shall have been made." 445 U.S. at 541, 100 S.Ct. 1349. Relying on that statute, individual Native American allottees sued the United States for alleged breach of its fiduciary duty to properly manage certain timber resources (located on the reservation) for the production of income. One of our predecessor courts, the Court of Claims, denied the United States' motion to dismiss the action, reasoning that the plain language of the statute created a general fiduciary duty enforceable against the United States by means of a claim for money damages. The Supreme Court disagreed, holding that the language of the statute, when understood in light of the legislative history, "created only a limited trust relationship between the United States and the allottee that does not impose any duty upon the Government to manage timber resources." *Id.* at 542, 100 S.Ct. 1349. The Court concluded that "[a]ny right of the respondents [allottees] to recover money damages for Govern-

ment mismanagement of timber resources must be found in some source other than" the General Allotment Act. *Id.* at 546, 100 S.Ct. 1349. The Court noted that the "Court of Claims did not consider the respondents' [allottees'] assertion that other statutes ... render the United States liable in money damages for the mismanagement alleged in this case," *id.* at 546 n. 7, 100 S.Ct. 1349, and accordingly remanded the case for consideration of these alternative statutory bases for the United States' liability. *Id.* at 546, 100 S.Ct. 1349.

On remand, the Court of Claims found that the statutes relied upon by the allottees other than the General Allotment Act—conferring responsibility on the federal government for timber management on Indian lands, roadbuilding and the granting of right-of-way over those lands, and trust fund management [8]—created a trust relationship sufficient to ground a claim for money damages under the Tucker Act. *Mitchell v. United States*, 229 Ct. Cl. 1, 664 F.2d 265, 269 (Ct.Cl.1981) (en banc). The Court of Claims accordingly denied the government's motion to dismiss the action.

In *Mitchell II*, the Supreme Court agreed that the allottees had properly stated a claim against the United States for breach of trust, reasoning that:

> In *[Mitchell I]*, this Court recognized that the General Allotment Act creates a trust relationship between the United States and Indian allottees but concluded that the trust relationship was limited.... *In contrast to the bare trust created by the General Allotment Act, the statutes and regulations now before us clearly give the Federal Government*

---

**8.** Those statutes involved, *inter alia*, timber management on Native American lands (25 U.S.C. §§ 406, 407, 466), roadbuilding on and rights-of-way over those lands (25 U.S.C. §§ 318, 323–325), and the administration of funds held in trust for Native American trusts (25 U.S.C. § 162a). *Mitchell v. United States*, 229 Ct.Cl. 1, 664 F.2d 265, 269–274 (Ct.Cl. 1981) (en banc).

*full responsibility to manage Indian resources and land for the benefit of the Indians.* They thereby establish a fiduciary relationship and define the contours of the United States' fiduciary responsibilities.

*Mitchell II,* 463 U.S. at 224, 103 S.Ct. 1261 (emphasis added). In reaching this conclusion, the Court first noted (with regard to the timber management statutes) that "[v]irtually every stage of the process is under federal control," and that "[t]he Department [of the Interior] exercises comparable control over grants of rights-of-way on Indian lands held in trust." *Id.* at 222–23, 103 S.Ct. 2961. The Court further observed that "[t]he language of these statutory and regulatory provisions directly supports the existence of a fiduciary relationship." *Id.* at 224, 103 S.Ct. 2961.

The Supreme Court has not provided further guidance in this area since the 1983 decision in *Mitchell II,* though a number of lower court decisions, including decisions of this court, have applied the holdings of the *Mitchell* cases in other statutory contexts. For example, in *Pawnee v. United States,* 830 F.2d 187 (Fed. Cir.1987), *cert. denied,* 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988), this court concluded that the Indian Long Term Leasing Act, 25 U.S.C. § 396, and the Federal Oil and Gas Royalty Management Act, 30 U.S.C. §§ 1701–1757, "give elaborate powers to Interior with respect to" oil and gas leases on mineral lands held in trust for the Native Americans. *Id.* at 190. Relying on *Mitchell II,* we accordingly held that those statutes imposed fiduciary obligations on the United States. *Id.; see also Brown v. United States,* 86 F.3d 1554, 1563 (Fed.Cir.1996) (concluding that "the commercial leasing regime created for [Native American] trust lands in 25 U.S.C. § 415(a) and 25 C.F.R. part 162 imposes general fiduciary duties on the government in its dealings with the Indian allottee-lessors"); *Short v. United States,*

50 F.3d 994, 998 (Fed.Cir.1995) (holding that certain federal statutes providing for the payment of interest on tribal trust funds held by the United States, "in conjunction with the government's fiduciary duty to Native American tribes, give the plaintiffs a substantive right to damages, including interest" for breach of that duty) (citing *Mitchell II,* 463 U.S. at 224–26, 103 S.Ct. 2961).

On this appeal, the government urges that the *Mitchell* cases, read together, impose a fiduciary obligation only when the pertinent statute or other authorizing document creating the trust relationship also directs the United States to manage the trust corpus for the benefit of the beneficiaries, *i.e.,* the Native Americans. It is undisputed that the 1960 Act contains no such requirement, and the government accordingly argues that the statute cannot serve as a basis for the imposition of fiduciary obligations on the United States. We do not agree.

To be sure, *Mitchell II,* which found a fiduciary obligation, involved a situation where the government not only controlled the trust corpus, but also had an obligation to manage it for the benefit of the Indians. But the language of *Mitchell II* makes quite clear that control alone is sufficient to create a fiduciary relationship. The Supreme Court in that case emphasized that:

[W]here the Federal Government takes on or has *control or supervision* over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection.

*Mitchell II*, 463 U.S. at 225, 103 S.Ct. 2961 (quoting *Navajo Tribe of Indians v. United States*, 224 Ct.Cl. 171, 624 F.2d 981, 987 (Ct.Cl.1980)) (emphasis added).

In *Brown v. United States*, 86 F.3d 1554 (Fed.Cir.1996), we held that control alone was sufficient to establish a fiduciary relationship there. In that case, in 1964, Native American allottees, pursuant to the leasing power extended to them by 25 U.S.C. § 415,[9] collectively leased their land for use as a commercial golf course. In 1990, the Bureau of Indian Affairs, acting under 25 C.F.R. § 162.14,[10] determined that the lessee had breached the lease agreement and that this breach precluded the lessee from exercising an option to renew the lease.

The allottees brought a breach of trust action against the United States in the Court of Federal Claims for money damages arising from the government's refusal to allow the lessee to renew the lease. The court granted a motion to dismiss by the United States for lack of subject matter jurisdiction, concluding that section 415 and the corresponding regulations "cannot be fairly interpreted to mandate the payment of compensation for breaches thereof." *Brown*, 86 F.3d at 1557. In reaching that conclusion, the trial court noted that the government's "control over the Indian lands authorized by the applicable legal provisions is not sufficiently elaborate or pervasive to create a fiduciary obligation in the United States." *Id.* at 1558.

■■■ On appeal, the United States argued that under *Mitchell II*, fiduciary "liability only comes into existence when the government actively manages the land at issue." *Id.* We disagreed, reasoning that:

Brown contends, quite correctly, that the trial court erred in the instant case by imposing a more restrictive test for the existence of a fiduciary duty than was established by *Mitchell II*. The Supreme Court did not qualify "control or supervision" with modifiers such as "significant," "comprehensive," "pervasive," or "elaborate." Nor did the Court anywhere suggest that the assumption of either control or supervision alone was insufficient to give rise to an enforceable fiduciary duty.

*Id.* at 1561. We therefore determined that "[t]he proper test of whether the government has assumed fiduciary duties in the commercial leasing of allotted lands is thus whether," under the pertinent statutes and/or regulations, "the Secretary [of the Interior], rather than the allottees, has control or supervision over the leasing program." *Id.*[11]

In the present case, the 1960 Act authorizes the government to use the Tribe's trust property for governmental purposes. Pub.L. No. 86–392, 74 Stat. 8 (1960) (creat-

---

9. In 1964, section 415 provided, in pertinent part, that "[a]ny restricted Indian lands, whether tribally or individually owned, may be leased by the Indian owners, with the approval of the Secretary of the Interior, for public, religious, educational, recreational, residential or business purposes ... and all leases and renewals shall be made under such terms and regulations as may be prescribed by the Secretary of the Interior." The statute was amended in 1970 and this portion of the statute may now be found in subsection (a) of current section 415.

10. That regulation, in pertinent part, empowered the Secretary of the Interior to terminate a lease made under section 415 "[u]pon a showing satisfactory to the Secretary that there has been a violation of the lease or the regulations in this part."

11. We note, however, that even where the government has neither control nor supervision of trust property it may have certain fiduciary obligations. *See, e.g., Lane v. Pueblo of Santa Rosa*, 249 U.S. 110, 39 S.Ct. 185, 63 L.Ed. 504 (1919) (holding that United States could not alienate trust lands currently occupied by Native Americans).

ing trust "subject to the right of the Secretary of the Interior to use any part of the land and improvements for administrative or school purposes...."). We think that, to the extent that the government has actively used any part of the Tribe's trust property, and has done so in a manner where its control over the buildings it occupies is essentially exclusive, the portions of the property that have been so used can no longer be classified as being held in merely a "bare trust" under *Mitchell I*. Rather, the government's decision to use such trust property for its own purposes carries a responsibility to act as a fiduciary. Although neither the 1960 Act nor any pertinent regulation sets forth clear guidelines as to how the government must manage the trust property, we think it is reasonable to infer that the government's use of any part of the property requires the government to act in accordance with the duties of a common law trustee, as is discussed in greater detail below. *See Restatement (Second) of Trusts* § 176 cmt. b (1959) ("It is the duty of the trustee to use reasonable care to protect the trust property from loss or damage."). Such a duty would apply only as to the specific parcels of trust property that the federal government has used and controlled, and possibly the grounds immediately surrounding such parcels.

The record in this case is unclear as to the extent of the government's control and use of the many buildings and grounds comprising Fort Apache. The Tribe alleges in its complaint that it "has not had control over the Tribe's buildings and improvements used, occupied, controlled, supervised and managed by [the United States] for Federal government administrative and school purposes." To the extent that the federal government has, indeed, used buildings to the exclusion of the

Tribe, we think the federal government does owe a fiduciary duty. Where such use and control was absent, the government owes no such duty. On remand the Court of Federal Claims must determine which portions of the trust property were under exclusive United States control and thus the subject of a fiduciary obligation.[12]

## V

■■■ We must next determine whether the complaint here states a claim enforceable in a present suit for money damages with respect to the property controlled by the United States. It is undisputed that the 1960 Act does not explicitly define the government's obligations. Once we have determined that a fiduciary obligation exists by virtue of the governing statute or regulations, it is well established that we then look to the common law of trusts, particularly as reflected in the *Restatement (Second) of Trusts*, for assistance in defining the nature of that obligation. For example, in *Mitchell II*, the Court relied upon the *Restatement (Second) of Trusts* and secondary authorities to inform its discussion of the remedies available to beneficiaries for a trustee's breach of its obligations. *Mitchell II*, 463 U.S. at 226, 103 S.Ct. 2961. This approach by the Court follows on several decisions in breach of trust cases brought by Native Americans that similarly relied upon the Restatement or secondary authorities on the common law of trusts. For example, in *Seminole Nation v. United States*, 316 U.S. 286, 296, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942), the Court cited with approval the *Restatement (First) of Trusts* when adjudicating a breach of trust claim brought against the United States by a Native American tribe. *See also United States v. Mason*, 412 U.S. 391, 398, 93 S.Ct. 2202, 37

---

**12.** If any of the buildings was constructed after the creation of the trust in 1960, the government's obligation with respect to those buildings may be quite different.

L.Ed.2d 22 (1973) (relying on secondary authority); *Dep't of Interior v. Klamath Water Users Protective Ass'n,* —— U.S. ——, ——, 121 S.Ct. 1060, 1068, 149 L.Ed.2d 87 (U.S.2001) (citing to the *Restatement (Second) of Trusts*); *cf. Kolstad v. American Dental Ass'n,* 527 U.S. 526, 538, 541, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) (looking to Restatements of Torts and Agency for guidance in interpreting federal statute).

Under the common law of trusts, it is indisputable that a trustee has an affirmative duty to act reasonably to preserve the trust property. As the Restatement makes clear, "[t]he trustee is under a duty to the beneficiary to use reasonable care and skill to preserve the trust property." *Restatement (Second) of Trusts* § 176 (1959). Comment (b) to this provision makes clear that this obligation extends to the protection of the trust property from loss or damage: "It is the duty of the trustee to use reasonable care to protect the trust property from loss or damage."

In *Masayesva ex rel. Hopi Indian Tribe v. Hale,* 118 F.3d 1371, 1385 (9th Cir.1997), *cert. denied,* 522 U.S. 1114, 118 S.Ct. 1048, 140 L.Ed.2d 112 (1998), the Hopi Tribe brought a breach of trust action against, *inter alia,* the United States, to recover damages for the overgrazing, by another tribe's cattle, of land held in trust by the United States for both tribes. While affirming the district court's judgment of no liability, the Ninth Circuit noted that the district court appeared to have applied the wrong standard because it applied a "reasonable person" rather than a "reasonable trustee" standard:

> Since the government's liability is predicated on trust obligations, it need take those protective measures that a reasonable or prudent trustee would take. Restatement, (Second) Trusts, § 176.

*Id.* at 1385 (internal citations omitted). *See also Coast Indian Community v. United States,* 213 Ct.Cl. 129, 550 F.2d 639, 653 (Ct.Cl.1977) (per curiam) (adopting trial court's decision which awarded damages to individual Native Americans for government's breach of its fiduciary obligation "to exercise due care and prudence to preserve the trust property"); *cf. Branson Sch. Dist. RE–82 v. Romer,* 161 F.3d 619, 637 (10th Cir.1998) (noting that the common law of trusts obligates a trustee to "take steps to preserve the trust property from loss, damage or diminution in value"), *cert. denied,* 526 U.S. 1068, 119 S.Ct. 1461, 143 L.Ed.2d 546 (1999); *Pelt v. Utah,* 104 F.3d 1534, 1542–44 (10th Cir. 1996) (concluding, based in part on application of section 2 of the *Restatement (Second) of Trusts* (1959), that individual Native Americans beneficiaries of an oil and gas royalty trust fund had properly stated a breach of trust claim arising from Utah's alleged mismanagement of that fund).

Other secondary authorities support the proposition that the trustee has an affirmative duty to act reasonably to preserve the trust property. As Professor Bogert has noted:

> The trustee has a duty to protect the trust property against damage or destruction. He is obligated to the beneficiary to do all acts necessary for the preservation of the trust res which would be performed by a reasonably prudent man employing his own like property for purposes similar to those of the trust.

George G. Bogert, *The Law of Trusts and Trustees,* § 582, at 346 (2d ed.1980). *See also* 2A Austin W. Scott & William F. Fratcher, *The Law of Trusts* § 176, at 482 (4th ed. 1987) ("It is the duty of the trustee to use care and skill to preserve the trust property. The standard of care and skill which is applicable to this duty,

as it is to his other duties, is that of a man of ordinary prudence.") [hereinafter Scott & Fratcher].

Here we believe that general principles of trust law obligate the United States "to use reasonable care and skill," *Restatement (Second) of Trusts* § 176, to "preserve the trust property from loss, damage or diminution in value." *Branson Sch. Dist. RE–82*, 161 F.3d at 637. This obligation includes an obligation to make appropriate repairs to buildings. As stated in 3 Scott & Fratcher, § 188.2, at 53–54, "[t]he trustee is ordinarily under a duty to keep in proper repair buildings and other property that he holds in trust.... Such repairs include whatever is reasonably necessary to preserve the property and to keep it in proper condition." The government as trustee "owes the beneficiary [here, the Tribe] the duty of using the care of a reasonably prudent man in protecting the trust res against decay and deterioration caused by use, by the elements, by catastrophe, or otherwise...." Bogert, *The Law of Trusts and Trustees,* § 600, at 513. Indeed, under the common law of trusts, "[t]he first duty of a trustee must be to preserve the trust property intact. To do this, he must not suffer the estate to waste or diminish, or fall out of repair...." *Id.* at 514.

A trustee's failure to act reasonably to preserve the trust property will also support a claim for permissive waste, a type of claim which is analogous to a claim under the law of property. "Waste" is generally defined as "the destruction, alteration, misuse, or neglect of property by one in rightful possession to the detriment of another's interest in the same property." 8 Richard R. Powell & Michael A. Wolf, *Powell on Real Property,* ¶ 636, at 56–3 (2000).

"Permissive waste," in turn, generally results "from the failure of the possessor to exercise the care of a reasonable person to preserve and protect the estate for future interests." 8 *id.* ¶ 640[3], at 56–22. That "care of a reasonable person" accordingly requires a tenant to "keep the premises in the condition it was in when the tenancy began, general wear and tear excepted." 8 *id.* ¶ 640[3], at 56–25.

In short, the government here has a fiduciary obligation to act reasonably to maintain and repair the trust property. It is also well settled that where, as here, a trust is created for successive beneficiaries, the trustee owes a duty to act impartially as between or among them. As the Restatement makes clear, "[i]f a trust is created for beneficiaries in succession, the trustee is under a duty to the successive beneficiaries to act with due regard to their respective interests." *Restatement (Second) of Trusts* § 232 (1959). The court must be particularly careful in scrutinizing the government's actions since the government's simultaneous role as trustee and beneficiary of the trust creates a conflict of interest as to the fulfillment of that fiduciary obligation. Indeed, this type of conflict is hardly unique. It is axiomatic that where the sole trustee is one of the beneficiaries, there is a "danger that the trustee will unduly favor himself." 2 Scott & Fratcher, § 99.3, at 63. Actions of the trustee in such a situation "might well be subject to careful scrutiny to determine whether in view of [its] antagonistic interest [it] was abusing the discretion conferred upon" it to fulfill its obligations to the Tribe. 2 *id.* § 107.1, at 120.

Application of these principles mandates that "[w]here the trustee is one of the beneficiaries, he will not be permitted in the administration of the trust to favor his own interest at the expense of that of other beneficiaries." 2A *id.* § 183, at 560. In other words, notwithstanding its role as a beneficiary, the United States as trustee is required "to act with due

regard" to the interests of the Tribe in the trust property. *Restatement (Second) of Trusts* § 232 (1959).

 While we look to the law of trusts for the general principles that govern the obligations of the United States as trustee, in each case we must also examine the particular statute, treaty, "or other fundamental document," *Mitchell II*, 463 U.S. at 225, 103 S.Ct. 2961, that creates the trust relationship in order to determine the nature of that relationship and whether the general law of trusts has been altered in any particular way, either by the imposition of additional obligations or by the modification of existing obligations. Here, we believe that the 1960 Act establishes several important principles.

 First, the right of the United States to use the trust property is expressly limited to use for "administrative or school purposes." Pub.L. No. 86–392, 74 Stat. 8 (1960). Use of the property for other purposes constitutes a breach of trust. Indeed, the government appears to agree, but urges that such impermissible uses have not occurred here.

 Second, the reasonableness of the government's actions are to be measured by the potential loss of economic value to the Tribe unless the Tribe can establish that the United States, when it passed the 1960 Act, undertook an obligation to maintain the property for other purposes. Indeed, as the Restatement makes clear, "[t]he intention of the settlor which determines the terms of the trust is his intention *at the time of the creation of the trust* ...." *Restatement (Second) · of Trusts* § 4 cmt. a (emphasis added). Our attention has been directed to nothing in the statute, its background, or its legisla-

tive history that suggests that the United States assumed any obligation to maintain the property for aesthetic or historical purposes. Absent further evidence that the trust created by the 1960 Act had non-economic purposes, the Court of Federal Claims must assume that the purpose was entirely economic.

 Third, the obligation of the United States to maintain the property for eventual transfer to the Tribe must be defined in light of the anticipated duration of the United States' use of the trust property at the time the 1960 Act was passed; the possible need of the United States to modify or demolish existing structures in order to make use of the property during the period of United States occupancy; and the economic value of the property at the time of the alleged breach. In deciding these questions, the propriety of the actions of the United States is to be measured against the standard of a reasonable trustee. *Restatement (Second) of Trusts* § 176.

 Finally, in addition to an obligation to maintain and repair the property, the United States may be obligated to restore the property upon transfer to the Tribe if the United States has violated its maintenance obligations during the term of the trust [13] or if it has (properly) modified the property to suit its own needs during the term of the trust. We do not suggest that the occurrence of normal wear and tear obligates the United States here to restore the property to its original (1960) condition, and we otherwise express no views as to the existence or nature of an obligation to restore the property, which must be determined by the general law of trusts as modified by the 1960 Act.

---

**13.** *See Restatement (First) of Property* § 187 cmt. b at 760 (1936) (stating that where the owner of a life estate has improperly altered a building, the owner of an indefeasibly vested future interest in that building can compel the "restoration of the premises to the condition in which they were prior to the doing of the prohibited act").

## VI

It remains only to be determined whether breach of the government's obligations, if proven by the Tribe on remand, gives rise to a presently cognizable claim for money damages. We hold that it does. As the Supreme Court held in *Mitchell II:*

> Given the existence of a trust relationship, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties. It is well established that a trustee is accountable in damages for breaches of trust.

*Mitchell II,* 463 U.S. at 226, 103 S.Ct. 2961. The Restatement of Trusts provides further support for this proposition. *Restatement (Second) of Trusts* § 205 (1959) ("If the trustee commits a breach of trust, he is chargeable with (a) any loss or depreciation in value of the trust estate resulting from the breach of trust; . . .").

While the Court of Federal Claims appeared to recognize that a traditional breach of trust claim, if one was available, necessarily states a claim for money damages, that court appeared to suggest that a damages remedy for permissive waste by analogy to the law of property could not be maintained at all, and that the only available remedy was injunctive. In this the court was mistaken.

The Court of Federal Claims observed that "an action for permissive waste, even if proper, does not ordinarily give rise to a money claim." *White Mountain Apache Tribe,* 46 Fed. Cl. at 28. The government urges that sections 188, 189, and 195 of the *Restatement (First) of the Law of Property* (1936) apply to the Tribe's claims and support the court's holding. But those provisions have no application here. That Restatement is clear that it does not directly apply to trust situations. *Id.,* note to ch. 13, at 753 ("When the person seeking protection has a future beneficial interest under a trust, the protections available to him . . . are a part of the Law of Trusts and are outside the scope of this Restatement."). In any event, those provisions discuss the remedies available to owners of *contingent* future interests in property when the present holder of a life estate acts or fails to act in a manner causing damage to that property. For example, section 188 of the Restatement provides, in pertinent part, that the holder of a contingent future interest in property "cannot recover damages immediately payable to himself for any act or omission of the owner of the estate for life." [14] Similarly, section 189 provides, in pertinent part, that the owner of a contingent future interest can obtain a variety of equitable remedies against the present injurious owner of a life estate in property, including "a prohibitive injunction appropriate to prevent the future doing of affirmative acts of the type theretofore done, or threatened to be done, by the owner of the estate for life." *Id.* at § 189(a).

There is nothing contingent about the Tribe' s future interest in the trust property. In other words, nothing can divest the

---

14. Section 188 provides: "When a present estate for life precedes a future interest in fee simple which is subject to a condition precedent, or which is vested but defeasible either in whole or in part upon an event the occurrence of which is not improbable, then the owner of such future interest, in a judicial proceeding brought solely in his own behalf, cannot recover damages immediately payable to himself for any act or omission of the owner of the estate for life." *Restatement (First) of Law of Property* § 188 (1936). Comment (a) accompanying this section makes clear that it applies only to holders of *uncertain* future interests: "All situations to which the negative rule in this Section is applicable have two elements in common. . . . *The second of these is an uncertainty as to the future interest.*" *Id.* cmt. a, at 765–66 (emphasis added). Here, however, there is no "uncertainty as to the future interest" of the Tribe in the trust property.

Tribe of full title to that property once the government terminates its trust relationship. The Tribe's interest in the trust property is accordingly better described as an indefeasibly vested future interest, and the government's interest better described as one akin to a present life estate in the trust property.

Under these circumstances, the more nearly analogous provisions are sections 139 and 187 of the *Restatement (First) of Property* (1936). Under those sections, a beneficiary has an immediate claim for money damages for any alleged failure to maintain and repair buildings.

For example, section 139, entitled "Duty Not to Permit Deterioration of Land or Structures," provides, in pertinent part, that (subject to certain exceptions not applicable here) "the owner of an estate for life ... has a duty to preserve the land and structures in a reasonable state of repair...." Moreover, comment (c) to that section provides, in pertinent part, that:

> A repair or act of preservation is clearly within such duty whenever such repair or act is necessary to prevent a progressive deterioration of the land or structures or whenever the condition existing as a result of the failure to make such repair will amount to substantial deterioration of the land or structures from the condition in which such land and structures were at the time of the commencement of the estate for life.

*Id.* at § 139 cmt. c. Section 187 of the Restatement further provides that the owner of an indefeasibly vested future interest has the right to expect compliance by the owner of the life estate with this duty of preservation:

> When the ownership of land is divided into two interests, one being a present estate for life and the other being an indefeasibly vested future interest in fee simple absolute, then the future interest includes (a) a right correlative to each of the duties of the owner of an estate for life, [as] stated in ... § 139 (duty not to permit deterioration of land or structures)....

*Id.* at § 187.

■ Finally, an accompanying comment makes clear that in the event the owner of the preceding estate—here, the United States—breaches this duty, the owner of the indefeasibly vested future interest can recover immediate damages for that breach:

> When the right of the owner of the future interest is that the owner of the estate for life shall do a given act, as for example, ... make repairs (see § 139), then this right is made effective through compelling by judicial action the specific doing of the act in question, *or through giving to the owner of the future interest a judgment for the damages caused to him by the omission to act.*

*Id.* at § 187 cmt. b, at 759 (emphasis added).[15]

**15.** The dissent concludes that there is no right to sue for damages because the Tribe's future interest is "contingent" under section 187 of the *Restatement (First) of Property*, there being "no certainty that the Tribe's future interest will ever vest." Even if the *Restatement (First) of Property* were the correct source of law for trust questions, enjoyment of the estate by the Tribe was certain because Congress, in providing for a remainder interest in the Tribe, plainly did not contemplate that the government's use for administrative or school purposes would be perpetual.

While the timing of the end of the government's use may have been uncertain, there was no question that the Tribe had the only remainder interest and that that interest was therefore indefeasibly vested rather than contingent. *See Restatement (First) of Property* § 157 cmt. f, at 546 (1936) ("When a remainder is indefeasibly vested, the remainderman is certain to acquire a present interest at some time in the future, and is also certain to be entitled to retain permanently thereafter the present interest so acquired.").

To be sure, the *Restatement (First) of Property* is concerned with the right of a vested

In sum, we hold that the Tribe's claim gives rise to a cognizable claim for money damages. Accordingly, we hold that the Court of Federal Claims has jurisdiction to entertain it.

## VII

We conclude that the 1960 Act creates an enforceable fiduciary relationship between the United States and the Tribe, the breach of which may give rise to a cognizable claim for money damages. On remand, however, the Court of Federal Claims may determine that the suit is premature as to buildings that the United States continues to use for administrative or school purposes. *See* note 15, *supra.* On remand, the Court of Federal Claims must further determine which portions of the property were under United States control. Even as to the property that was so controlled, we recognize that the existence of this "general fiduciary relationship does not mean that any and every claim ... necessarily states a proper claim for breach of the trust a claim which must

be fully tried" in the Court of Federal Claims. *Pawnee v. United States,* 830 F.2d 187, 191 (Fed.Cir.1987), *cert. denied,* 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988). The merits of the Tribe's claim will be accordingly determined on remand in the light of this decision.

On this appeal, the government also argued that even if the Tribe has stated a proper claim, it is barred under the six-year statute of limitations set forth in 28 U.S.C. § 2501. We note that the Court of Federal Claims did not reach this argument, and we therefore leave this unanswered question to that court for resolution on remand.

## CONCLUSION

For the foregoing reasons, the decision of the Court of Federal Claims is reversed and remanded.

## *REVERSED AND REMANDED.*

No costs.

remainderman who succeeds after the end of a life estate (section 187) or multiple life estates (section 191), recognizing that the remainderman in both situations has the right to sue for damages. The *Restatement (First) of Property* does not address the timing of a remainderman's suit for damages where the timing of the enjoyment depends upon another event (here the end of the government's administrative or school use). This is hardly surprising since at common law this conveyance would have violated the rule against perpetuities. *See id.* at § 228 cmt. b., illus. 2, at 938 ("A, owning Blackacre in fee simple absolute, transfers Blackacre 'to B County so long as Blackacre is used as the site of the County Court House; thereafter to C and his heirs.' The attempted executory interest to C fails because of a violation of the rule against perpetuities."). The rule against perpetuities, however, is not a limitation on conveyances by the United States government.

This uncertainty in the duration of the prior estate, whether under the law of trusts or the law of property, suggests only that the compu-

tation of damages before the end of the preceding use may be possible in one situation (life estates) using actuarial tables but may be difficult in the latter situation until the occurrence of the event (here, the end of school or administrative use), and that the right of suit for damages in the latter situation may be premature until the happening of that event (end of statutorily authorized uses). *Cf. Boling v. United States,* 220 F.3d 1365, 1373 (Fed.Cir.2000) (holding that landowners' "takings claims [for government-caused erosion to property] accrued when the erosion had substantially encroached the parcels at issue and the damages were reasonably foreseeable").

Clearly this lawsuit is not premature as for those buildings that the government has ceased to use for administrative or school purposes. We leave this issue of possible prematurity as to those buildings still used by the government for resolution by the Court of Federal Claims, particularly since decision of those timing issues may affect the running of the statute of limitations.

MAYER, Chief Judge, dissenting.

I would affirm, both because the 1960 Act did not impose a fiduciary duty on the government and because the Tribe does not hold an indefeasibly vested future interest in the Fort Apache land and buildings. In *United States v. Mitchell*, 445 U.S. 535, 542, 546, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (*Mitchell I*), the Supreme Court held that statutes and regulations that create only a limited or "bare" trust relationship between the United States and the Tribes do not impose fiduciary obligations which would give rise to money damages. However, in *United States v. Mitchell*, 463 U.S. 206, 224, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (*Mitchell II*), the Court found that a fiduciary obligation existed when the statute or regulations give the government full responsibility for managing Indian resources and land for the benefit of the Indians. The statutes and regulations define the scope of the fiduciary obligation. *Id.* We held in *Brown v. United States*, 86 F.3d 1554, 1560 (Fed.Cir.1996), that the fiduciary duty need not be explicit in the statute or regulation, but the government must take on or have control or supervision of tribal monies or property.

In this case, the 1960 Act, which created the trust, reserved to the government the right to use any part of the land and improvements for administrative or school purposes for as long as they are needed for those purposes. This provision limits the government's obligation to the Tribe and creates a bare trust relationship similar to the General Allotment Act considered in *Mitchell I*. Nothing in the 1960 Act imposes a fiduciary responsibility to manage the fort for the benefit of the Tribe and, in fact, it specifically carves the government's right to unrestricted use for the specified purposes out of the trust. Although the school is for the benefit of the Tribe, the 1960 Act expressly permits, but

does not require, the government to use the fort as an Indian school. The use of the phrase "for as long as they are needed," far from expressing a fiduciary obligation, vests discretion in the Secretary of the Interior to determine how long to operate the Indian school. Because the subject matter of the trust excluded the government's use privilege from the start, it has no fiduciary obligation to maintain the land and improvements for the Tribe that could lead to money damages.

Accordingly, there should be no need to address whether the future interest held by the Tribe is vested or contingent. In reaching the issue, however, the court has misconstrued the nature of the trust and improvidently held that "[t]here is nothing contingent about the Tribe's future interest in the trust property." *White Mountain Apache Tribe v. United States*, ante at 25. In fact, the government has reserved the right to use the trust property "for as long as [it is] needed" for school or administrative purposes. Nothing in the grant precludes the possibility that it will be needed in perpetuity for those purposes; there is no certainty that the Tribe's future interest will ever vest. It is therefore contingent and, as the court aptly points out, the owner of a contingent future interest has no right to sue for money damages for permissive waste. *Id.*

The government argued that the Tribe's future interest was contingent and that the common law of property as reflected in sections 188, 189, and 195 of the Restatement (First) of the Law of Property bars the Tribe's claim for monetary damages. The court does not disagree that money damages would be barred if the Tribe's future interest were contingent; it merely asserts that it is not. Therein lies the error. As the court said,

> Section 188 provides: "When a present estate for life precedes a future interest

in fee simple which is subject to a condition precedent, or which is vested but defeasible either in whole or in part upon an event the occurrence of which is not improbable, then the owner of such future interest, in a judicial proceeding brought solely in his behalf, cannot recover damages immediately payable to himself for any act or omission of the owner of the estate for life." *Restatement (First) of Law of Property* § 188 (1936).

*White Mountain Apache Tribe, ante* at 24 n. 14. The court goes on to note that there must be an uncertainty as to the future interest for this rule to apply, and makes the conclusory statement that there is "no 'uncertainty as to the future interest' of the Tribe in the trust property." *Id.* Contrary to this assertion, there is a condition precedent to the vesting of the Tribe's future interest, namely that the government no longer needs to use the property for school or administrative purposes. Until the Secretary of the Interior determines that the property is no longer needed for school or administrative purposes, the condition precedent will not occur, and the Tribe's interest will not vest. Because there is nothing in the 1960 Act that prevents the government from continuing to use the property for school or administrative purposes indefinitely, there is no guarantee that the condition precedent will ever be met and the Tribe's future interest will ever vest. This precludes its claim for money damages and is an independent ground on which to affirm the judgment of the Court of Federal Claims.